## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**MARIA A. ORESTANO**,

      **Plaintiff,**

**v.**                                                                    **Case No. 8:05-CV-2354-T-27EAJ**

**LINDA S. MCMAHON,[1]**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to the Social Security Act (the "Act"), as amended, Title 42, United States Code, Section 405(g) et seq., to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying DIB and SSI benefits.[2]

The undersigned has reviewed the record, including a transcript of the proceedings before the Administrative Law Judge ("ALJ"), the exhibits filed, the administrative record, and the pleadings and memoranda submitted by the parties in this case.

**A.     Standard of Review**

In an action for judicial review, the reviewing court must affirm the decision of the

_____

[1]  On January 20, 2007, Linda S. McMahon became the Acting Commissioner of Social Security. Therefore, pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, Linda S. McMahon should be substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]  The District Judge has referred this matter to the undersigned for consideration and a Report and Recommendation.  See Local Rules 6.01(b) and 6.01(c), M.D. Fla .

Commissioner if it is supported by substantial evidence in the record as a whole and comports with applicable legal standards. See 42 U.S.C. § 405(g)(2003). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). If there is substantial evidence to support the Commissioner's findings, this court may not decide the facts anew or substitute its judgment as to the weight of the evidence for that of the Commissioner. Goodley v. Harris, 608 F.2d 234, 236 (5th Cir. 1979).[3]

If the Commissioner committed an error of law, the case must be remanded to the Commissioner for application of the correct legal standard. See Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). If the reviewing court is unable to determine from the Commissioner's decision that the proper legal standards were applied, then a remand to the Commissioner for clarification is required. See Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987).

**B.     Factual Background**

Plaintiff filed her initial application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on May 2, 1999, claiming an onset of disability beginning August 1, 1997. (T 41-43) Plaintiff's application was denied initially, upon reconsideration, and, after a hearing on the issues, by the Administrative Law Judge ("ALJ") in a decision issued November 3, 2000.[4] (T 11-20) Plaintiff appealed to District Court, and on August 22, 2002, the

---

[3] Fifth Circuit decisions rendered prior to September 30, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

[4] Meanwhile, Plaintiff filed new applications for SSI and DIB on September 20, 2001, and Plaintiff was found to be disabled as of November 4, 2000, the day after the ALJ's initial decision. (T 411)

District Judge, pursuant to the Commissioner's unopposed motion before any memoranda had been filed, remanded the case for further action under sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3).

> The District Judge's remand order states:
>
> The Appeals Council will instruct the [ALJ] to further evaluate all of the evidence of record, including the records regarding Plaintiff's right upper extremity impairments and resulting limitations indicated in the progress notes and the findings made by the treating and examining sources, Drs. Schwab, McAllister, and Linder (Tr. 149, 164, 204-210, 258-259).

(T 464-65)

Subsequently, by order dated October 25, 2002, the Appeals Council remanded the case to the ALJ for further consideration and a hearing. (T 411)  The ALJ then held a second hearing on Plaintiff's application on March 4, 2003, (T 433-62) and issued a decision on April 11, 2003. (T 411-23)  The ALJ found that Plaintiff was not disabled for the time period of August 1, 1997, through November 3, 2000, the date of the ALJ's initial decision.[5] (T 423)

Plaintiff filed a timely petition for judicial review of the Commissioner's denial of benefits. Plaintiff has exhausted all administrative remedies and the Commissioner's decision is ripe for review under the Act.

Plaintiff was born in 1954 and was 43 through 46 years old during the time period at issue. (T 412, 435)  Plaintiff has a high school equivalency education and has attended some college. (T 435)  She has past relevant work experience as a receptionist, convenience store clerk, deli worker,

---

[5]  The ALJ also found that Plaintiff engaged in substantial gainful activity from November 1997 through May 1998 due to her work as a data entry clerk at Publix Supermarkets and Morton Plant Mease Health Care. (T 413) Plaintiff did not engage in substantial gainful activity after May 1998. (Id.)

3

truck unloader, laundry worker, rehab unit clerk, and catering specialist. (T 412) Plaintiff asserts that carpel tunnel syndrome, tendinitis, a torn knee, lupus, Hepatitis C, fibromyalgia, rheumatoid arthritis, chronic pain, anxiety, and depression have rendered her unable to work since August 1, 1997. (Id.)

Following the second administrative hearing, the ALJ found that Plaintiff had a history of bilateral carpel tunnel syndrome status post surgical release, right epicondylitis, status post arthroscopic surgery of the right knee, bursitis of the right shoulder, Hepatitis C, osteoarthritic deformities of the hands, peptic ulcer disease, adjustment disorder, panic disorder with agoraphobia, and a history of drug and alcohol abuse. (T 417) The ALJ determined that these impairments are severe but that they do not meet or medically equal the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Id.) The ALJ held that Plaintiff could not perform her past relevant work but that she retained the residual functional capacity ("RFC") to perform a significant range of sedentary work.[6] (T 420-21) The ALJ emphasized that Plaintiff was limited to only the occasional use of the right upper extremity for reaching and for fine and gross manipulative activities.[7] (T 422) The ALJ also limited the work Plaintiff could perform to simple, repetitive, unskilled jobs. (Id.)

---

[6] Sedentary work, defined at 20 C.F.R. § 404.1567(a), involves the lifting of no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Sedentary work may require a certain amount of walking or standing.

[7] Specifically, the ALJ found that Plaintiff "could lift 10 pounds occasionally and five pounds frequently; she could walk/stand for 2 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday; she could occasionally reach with the right upper extremity; and she could occasionally perform activities involving fine and gross motor manipulation with the dominant right upper extremity. The claimant remained able to perform the mental requirements of simple, repetitive, unskilled work activity." (T 422)

Relying on the testimony of a vocational expert ("VE") in response to a hypothetical question which incorporated these limitations, the ALJ concluded that Plaintiff could perform the job requirements of an order clerk and a receptionist/information clerk.  (T 421)   In reaching the conclusion that Plaintiff had not been under a disability since August 1, 1997, the ALJ held that Plaintiff's statements regarding her symptoms and impairments were not wholly credible.  (T 422)

The medical evidence has been summarized in the decision of the ALJ and will not be repeated here except as necessary to address the issues presented.

**C.    Discussion**

Plaintiff argues that the Commissioner erred by: (1) failing to follow the District Judge's instructions in the remand order by, among other things, not according the opinions of Plaintiff's treating physicians the proper weight, (2) issuing findings in the April 11, 2003 order that contradict those in the ALJ's November 3, 2000 opinion, (3) posing an incomplete hypothetical question to the VE, (4) issuing unsupported findings regarding manual dexterity, and (5) making a credibility determination without evaluating the testimony of Plaintiff's friend and former roommate (Dkt. 10 at 2-14).

Defendant maintains that the ALJ's decision that Plaintiff can perform a significant range of sedentary work is supported by substantial evidence (Dkt. 11 at 4).

**1.    ALJ's Evaluation of Opinions of Treating Physicians on Remand**

Plaintiff asserts that the ALJ, in violation of the remand order, improperly discounted the opinions of Plaintiff's treating physician Thomas Schwab, M.D. ("Dr. Schwab"), treating physician Charles McAllister, M.D. ("Dr. McAllister"), and consultative physician Owen Linder, M.D. ("Dr. Linder") regarding Plaintiff's right upper extremity impairments (Dkt. 10 at 2).  According to

Plaintiff, these physicians opined that Plaintiff experienced severe problems with both arms and hands and could not perform repetitive tasks involving the fine manipulation of objects.

In general, a treating physician's opinion is entitled to considerable weight unless there is good cause to reject it. Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982). However, the ALJ may reject the opinion of a treating physician if it is conclusory, contrary to the evidence, or unsubstantiated by any objective medical evidence. Bloodsworth v. Heckler, 703 F.2d at 1240; accord Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Johns v. Bowen, 821 F.2d 551, 555 (11th Cir. 1987). It is reversible error for the ALJ to ignore or fail to refute a treating physician's testimony. See MacGregor v. Bowen, 786 F.2d 1050 (11th Cir. 1986) (holding that the Commissioner accepted the opinions of the claimant's treating physicians as true when he made no finding as to the weight of their testimony and failed to discredit it).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supporting medical evidence; (4) the consistency with the record as a whole; (5) whether the physician specializes in the medical issues; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).

Dr. Schwab

The ALJ reviewed the treatment records and opinion of orthopedic specialist Dr. Schwab and

noted Dr. Schwab's treatment of Plaintiff in May 1993 for knee pain, in August 1997 for carpal tunnel surgery on her right wrist, in January 1998 for persistent pain in her right wrist, in December 1998, and in April 1999 for complaints of pain and numbness in her hands, right elbow pain, and the inability to do repetitive tasks. (T 413-14) Specifically, the ALJ discussed the results of Dr. Schwab's January 1998 examination of Plaintiff, which indicated tenderness at the scar site but no signs of thenar atrophy and negative Tinel's sign, Phalen's test, and proximal forearm compression test. (T 413)  The ALJ notes that Plaintiff told Dr. Schwab she was retraining to do administrative work that does not require her to slice meat, count money, scan groceries, or do any prolonged writing. (Id.)  Further, as the ALJ indicates, Dr. Schwab's treatment notes from a December 1998 office visit indicate that Plaintiff's carpel tunnel symptoms were markedly improved but that he still found tenderness over the lateral epicondyle on the right. (T 414) Dr. Schwab administered an injection of steroids. (Id.)

Dr. Schwab's April 1999 examination of Plaintiff indicated that Tinel's sign and Phalen's test were positive bilaterally, as stated by the ALJ. (Id.)  The ALJ also noted that after the April 1999 examination, Dr. Schwab opined that Plaintiff could not return to the repetitive activities required by her previous job as a cashier. (Id.)

Plaintiff argues that the ALJ mischaracterized Dr. Schwab's April 1999 findings regarding Plaintiff's work related limitations and did not give his opinion the proper weight (Dkt. 10 at 2).  In the "history" section of his April notes, Dr. Schwab recites Plaintiff's complaints and includes the statement, "[s]he cannot do anything repetitive." (T 149)  Additionally, in the section of the notes reserved for his treatment plan, Dr. Schwab states plainly, "I feel that the patient cannot do any repetitive activities." (Id.)  Dr. Schwab continues to note, however, that Plaintiff had the opportunity

to participate in vocational rehabilitation with the hope of switching fields to nursing "where she does not have to do the repetitive activities required in a cashier's job. . . . I feel that the patient is not able to go back to repetitive activities required with her previous job as a cashier."[8] (Id.)

In accordance with her duty to weigh the evidence, the ALJ considered Dr. Schwab's opinion as one of Plaintiff's treating physicians, including Dr. Schwab's notes regarding Plaintiff's upper right extremity. The ALJ's characterization of Dr. Schwab's statements regarding Plaintiff's work-related limitations is appropriate; Dr. Schwab clearly approved of Plaintiff enrolling in vocational rehab with the hope of switching to the nursing field.[9]

Further, although the ALJ's RFC determination is not inconsistent with Dr. Schwab's findings, the ALJ accorded greater weight to the findings and opinion of George Morris, M.D. ("Dr. Morris"). Dr. Morris is also an orthopedic specialist who treated Plaintiff from September 1999 through January 2000. (T 415, 420) Dr. Morris diagnosed left carpel tunnel syndrome and right tennis elbow. He performed surgery for carpel tunnel release of the left hand and a steroid injection for the right tennis elbow in October 1999. And in November 1999, Dr. Morris released Plaintiff to return to work as a cashier. (T 418) During a final office visit in January of 2000, Dr. Morris noted Plaintiff's complaints of pain in multiple joints of the right upper extremity, as noted by the

---

[8] Plaintiff's previous duties as a convenience store cashier included operating a cash register and stocking shelves. (T 348) As an order clerk, which the ALJ concluded was a job within Plaintiff's capabilities, Plaintiff would be required to take food and beverage orders over the telephone or intercom system and record these orders on a ticket, suggest menu items, answer questions regarding food or service, and may be required to collect charge vouchers and cash for service. Dictionary of Occupational Titles, 4th ed. Rev. 1991, No. 209.567-014.

[9] The undersigned also notes that during some of the time Dr. Schwab treated Plaintiff (from December 1997 through May 1998), Plaintiff was engaged in substantial work activity performing data entry and therefore was not disabled. (T 413)

ALJ, but X-rays found no marked synovitis and minimal arthritic changes. (T 415)

Additionally, other evidence in the record from treating physicians supports the ALJ's findings regarding Plaintiff's work limitations.  In June 1998, Harry Wilks, M.D. ("Dr. Wilks") examined Plaintiff and observed some discomfort in the right arm and shoulder but no muscle wasting, no synovitis, and good grip strength. (T 418)  In April 1999, Robert Henderson, M.D. ("Mr. Henderson") reported only minimal weakness in both hands and normal X-rays, despite Plaintiff's complaints of pain in her upper extremities. (Id.)  Dr. Henderson opined that Plaintiff's "complaints are somewhat out of proportion and her medication use is way out of line." (T 197)  He also noted that Plaintiff could be trained to reenter the work force if some of her medical problems, including her carpal tunnel and tennis elbow, were addressed, although he emphasized that "a lot of repetitive use with either hand will cause problems and just aggravate the carpal tunnel." (Id.)  Notably, it was after Dr. Henderson's examination that Dr. Morris performed carpal tunnel surgery on Plaintiff's left hand and administered a steroid injection for her tennis elbow. (T 415)

The ALJ's consideration of Dr. Schwab's opinion is based on substantial evidence as contained in the record as a whole, including Dr. Schwab's treatment notes regarding Plaintiff's upper right extremity. To the extent that Dr. Schwab's opinion conflicts with that of Dr. Morris, the duty to resolve conflicts in the evidence is the duty of the Commissioner in the first instance, not the reviewing court.  See generally Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  Plaintiff's argument that the ALJ ignored Dr. Schwab's description of Plaintiff's limitations is without merit.

<u>Dr. McAllister</u>

Plaintiff also argues that the ALJ's decision to discredit Dr. McAllister's opinion was improper because he was one of Plaintiff's long-term treating physicians and because he was the

only neurologist who examined Plaintiff.

In April 1999, as stated in the ALJ's opinion, Dr. McAllister notes some early osteoarthritic/rheumatoid deformities over Plaintiff's hands, marked loss of the inner muscles in both hands (right greater than left), and evidence of muscular weakness in both the ulnar and medial nerve distribution. (T 415)  He prescribed Narco tablets and gave Plaintiff samples of Pamelor. (Id.) Dr. McAllister's June 1999 examination of Plaintiff indicated that she had tendinitis in the right arm and left hand pain with early arthritis in the hands and weakness in the hands and arms. (418)  The ALJ also noted Dr. McAllister's conclusions that Plaintiff would have significant difficulty taking care of her child and that the variety of Plaintiff's complaints would limit her ability to work. (T 415, 418)

In accordance with her duty to weigh the evidence and the District Judge's remand instructions, the ALJ considered Dr. McAllister's opinion as a treating physician.  However, the ALJ discounted Dr. McAllister's opinion regarding Plaintiff's limitations because he is not an orthopedic specialist and he was not a long-term treating physician of Plaintiff's. (T 418)  Also, Dr. McAllister did not report any specific limitation of Plaintiff's ability to work, and he did not report that Plaintiff was unable to perform any work activity at all, two facts the ALJ considered when weighing Dr. McAllister's opinion. (T 418)

The record indicates that Dr. McAllister treated Plaintiff from April 23, 1999, to October 11, 1999, a period of five and one-half months.  Although the ALJ's opinion does not list every communication between Plaintiff and Dr. McAllister's office, it appears from a review of the treatment notes that Dr. McAllister examined and commented on Plaintiff's upper extremity impairments and resulting limitations on two occasions; the ALJ considered Dr. McAllister's notes

following each of these visits. (T 415, 418)  The remaining entries in Dr. McAllister's progress notes appear to be notes of telephone calls regarding medication refills and referrals.  On June 23, 1999, Plaintiff  contacted Dr. McAllister's office and stated that she was very ill and could not function. (T 259)  Dr. McAllister therefore examined Plaintiff on June 29, 1999, as the ALJ discusses. (T 257, 418)  Further, contrary to Plaintiff's assertion, Dr. McAllister is not a neurologist but an internist specializing in nephrology.[10] (T 164)  Finally, the ALJ did not discount Dr. McAllister's opinion in favor of the opinion of a consulting physician.  The ALJ's instead weighed more heavily Dr. Morris's opinion; Dr. Morris was Plaintiff's treating orthopedic specialist and performed Plaintiff's carpel tunnel surgery. (T 420)  Therefore, substantial evidence supports the ALJ's decision to discount Dr. McAllister's opinion.

Dr. Linder

Plaintiff argues that the ALJ's characterization of Dr. Linder's findings regarding Plaintiff's severe hand and arm problems is contrary to the evidence and that Dr. Linder's opinion supports those of Dr. Schwab and Dr. McAllister (Dkt. 10 at 3).  According to Plaintiff, the ALJ did not address Dr. Linder's observation that Plaintiff cradled a weight in her arms while carrying it across the room rather than carrying the weight in her hands.

Dr. Linder's evaluation occurred on January 12, 2000.  Regarding Plaintiff's ability to carry a 10-pound barbell, Dr. Linder stated that Plaintiff did not pick the barbell up with one hand because "she doubted she could." (T 208)  But she "bundled [the barbell] into two arms and then carr[ied]

---

[10]  In the progress notes from Dr. McAllister's June 29, 1999 examination of Plaintiff, he notes: "She continues to complain of neuropathic pain in her arms.  I think the next step would be [sic] evaluated by neurology and neurosurgery if her hepatitis work up is negative." (T 257) On July 27, 1999, Dr. McAllister's office informed Plaintiff of her Hepatitis C diagnosis and referred her to a "Dr. Borislow". (Id.)  Plaintiff's medical records contain no further mention of Dr. Borislow.

it back and forth across the room three times without difficulty except to be careful to handle it with two hands instead of one hand." (Id.)  The ALJ's opinion, in contrast, notes simply that Plaintiff "was able to lift and carry a 10-pound barbell back and forth across the room three times without difficulty." (T 416)

The ALJ's statement regarding the manner in which Plaintiff carried the barbell does not mischaracterize the evidence.  The ALJ's statement is preceded by a summary of Dr. Linder's findings as to Plaintiff's diminished grip strength in both hands and Dr. Linder's finding that Plaintiff's range of motion was diminished in her right shoulder. (T 416)  The ALJ also noted Dr. Linder's observation that Plaintiff had a small area of wasting between the thumb and first finger and decreased range of motion of the right shoulder. (Id.)  Moreover, Dr. Linder's findings are corroborated by those of Dr. Morris who also examined Plaintiff in January of 2000 and reported that Plaintiff's complaints were mainly addressed to her right upper extremity and that Plaintiff had no marked synovitis, no effusion, and only some mild discomfort with movement. (T 418)

The ALJ did not err in evaluating Dr. Linder's findings.  This portion of the ALJ's decision is supported by substantial evidence.

Emergency Room Physicians

Plaintiff also contends that the ALJ failed to consider the opinions of Plaintiff's treating physicians in the emergency room of Morton Plant Hospital, where Plaintiff went in January and February of 2000 (Dkt. 10 at 6).  According to Plaintiff, her mental impairments prevent her from performing any work at all, as reflected in tests performed by the Morton Plant Hospital emergency

room physicians (Id. at 6-7).[11]  Plaintiff contends that the emergency room physicians' opinions are bolstered by Global Assessment Functioning ("GAF") tests performed in January 2000 by consultative psychologist Gerald Hodan, Ph.D. ("Dr. Hodan").  Defendant counters that emergency room physicians are not considered treating source opinions and that the ALJ properly evaluated the impact of Plaintiff's mental impairments (Dkt. 11 at 12).

The ALJ held that Plaintiff suffered from the severe mental impairments of adjustment disorder and agoraphobia, and other severe physical impairments. (T 417)  After reviewing the record as a whole, the ALJ concluded that Plaintiff's mental impairments caused no more than mild restriction of daily activities, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (T 420) The ALJ restricted Plaintiff to simple, repetitive, unskilled work. (T 422)  In making this assessment, the ALJ noted "[t]here is not evidence of regular treatment by a mental health care professional, and the claimant relied mainly on emergency room visits and prescriptions for psychotropic medications provided by regular treating physicians." (T 419)

The ALJ reviewed the opinions of psychologist Mark Klisch, Ph.D. ("Dr. Klisch"), who evaluated Plaintiff in March 1999, consultative psychiatrist Stephen Szabo, M.D. ("Dr. Szabo"), who evaluated Plaintiff in April 1999, consultative psychiatrist M.J. Gimeno, M.D. ("Dr. Gimeno"), who performed an evaluation of Plaintiff in September 1999, and Dr. Hodan. (T 414-15, 419).

In March 1999, Dr. Kilsch diagnosed Plaintiff with adjustment disorder and a chronic depressed mood secondary to her physical health problems, and he assessed a GAF of 75, as the ALJ

---

[11] During Plaintiff's January 2000 emergency room visit, the consulting physician diagnosed Plaintiff with a GAF between 40-60. (T 265) In February 2000, after a brief stay in the emergency room, she was diagnosed with a GAF between 25-50. (T 294)

noted.[12] (T 414) Dr. Kilsch opined that Plaintiff's mental condition would make it difficult for her to concentrate on learning new tasks when under stress.  He recommended stress management for Plaintiff. (Id.)  One month later, in April 1999, Dr. Szabo's examination of Plaintiff showed mild to moderate depression and moderate anxiety. (Id.)  The ALJ considered that Dr. Szabo diagnosed Plaintiff with panic disorder, agoraphobia, and adjustment disorder with depressed mood. (Id.)  Plaintiff's GAF according to Dr. Szabo was 70. (Id.)

The next evaluation of Plaintiff's mental impairments was performed by Dr. Gimeno in September 1999. (T 245-247, 415) Dr. Gimeno diagnosed Plaintiff with panic anxiety attacks, major depression, and possible bipolar disorder. (T 246)  He also noted Plaintiff's histrionic personality features. (Id.)  Dr. Gimeno recommended that Plaintiff continue on her Paxil and assessed a GAF of 60.  (Id.)  Then, in January 2000, as the ALJ indicates, Dr. Hodan observed that Plaintiff suffered from anxiety and depression that affected her short-term memory to some degree. (T 415) Dr. Hodan assessed a GAF of 60 and opined that Plaintiff may have trouble switching between tasks at work but "otherwise displays adequate attention and concentration for understanding, remembering and following through on instructions given to her in a job setting." (T 202)

Thus, as Plaintiff indicates, her GAF score decreased over time.  Plaintiff argues that this fact

---

[12]  A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders DSM-IV at 30 (4th ed.1994). It is a "subjective determination." Chester v. Apfel, 182 F.3d 931, No. 98-7106, 1999 WL 360176, at *3 n.1 (10th Cir. June 4, 1999). The GAF score is taken from the GAF scale which "is to be rated with respect only to psychological, social, and occupational functioning." DSM-IV at 30.  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 32.  A low GAF score does not require a finding of disability.  Seymore v. Apfel, 131 F.3d 152, No. 97-5068, 1997 WL 755386, at *1-2 (10th Cir. Dec. 8, 1997) (GAF score of 45).

coupled with the low GAF scores assessed by the emergency room physicians in January and February of 2000 is evidence of Plaintiff's mental disability.  The ALJ, however, is charged with determining Plaintiff's RFC based on the evidence as a whole, not simply on GAF scores.  See Social Security Ruling 97-8p (stating that the ALJ must base an RFC on all the evidence in the record including "medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, effects of symptoms, evidence from attempts to work, need for a structured environment and work evaluations").

In this case, the ALJ considered Plaintiff's emergency room visits.  The ALJ states that Plaintiff was admitted to the emergency room in February and April of 2000 due to alcohol intoxication, not symptoms of an acute mental disorder. (T 419) In fact, the emergency room physician who treated Plaintiff in February 2000 after the police brought her in for suicidal statements she made when she was intoxicated, stated: "The patient clearly does not need to be here . . . . It sounds as though everybody involved overreacted to the situation which is what she tried to tell everyone, but nobody would listen to her." (T 294)  Further, GAF scores are not a reflection of a treating source's opinion regarding a claimant's RFC.

Therefore, the ALJ's analysis of Plaintiff's mental impairments is based on substantial evidence.

### 2.     ALJ's April 11, 2003 Order Compared to the November 3, 2000 Order

Plaintiff contends that the court should remand and reverse the ALJ's April 11, 2003 decision because certain of the ALJ's findings contradict those the ALJ made in her November 3, 2000 order. Specifically, Plaintiff alleges that the ALJ is estopped from making a finding in her second opinion that differs from those in her first opinion, unless the finding pertains to the ALJ's second look at

the medical opinions of Dr. Schwab, Dr. McAllister, and Dr. Linder.  In short, Plaintiff appears to argue that the District Court's remand order authorizes the ALJ to reexamine the evidence pertaining to these physicians' opinions but does not authorize any deviation from the ALJ's initial findings regarding every other topic.

The Commissioner addresses this argument in a footnote, stating that the District Court ordered the ALJ to reevaluate the evidence as a whole; therefore, the ALJ did not err in making findings in the second opinion that differ from those in the first opinion (Dkt. 11 at 14, n. 3).

In the second opinion, the ALJ concluded that Plaintiff engaged in substantial gainful work activity from November 1997 through May 1998 because she earned over $500 per month during this time period.  In contrast, in the first opinion, the ALJ held that Plaintiff had not engaged in any substantial gainful activity since August 1, 1997, the alleged onset of disability.  The ALJ's initial opinion does state, however, that Plaintiff's employment in 1998 "tends to contradict her allegations of inability to work as of August 1, 1997. . . . [T]he claimant's contradictory statements must be considered in the assessment of her credibility." (T 13)

As a preliminary matter, the remand order does not prohibit the ALJ from making different findings upon remand.  Among other things, the District Judge specifically directed the ALJ to "further evaluate Plaintiff's maximum RFC by providing sufficient rationale with specific references to the evidence of record in support of the assessed limitations." (T 464-65) Any difference between the findings contained in the ALJ's two opinions is due to the ALJ's more thorough review of the evidence upon remand.[13]  Moreover, the District Judge remanded the case to the Appeals Council

---

[13] Another contradictory finding, according to Plaintiff, concerns the ALJ's statement in the April 11, 2003 order that Plaintiff's RFC includes the ability to lift 10 pounds occasionally and five pounds frequently. (T 19)  In the first opinion, the ALJ did not state that Plaintiff could lift 10

pursuant to the Commissioner's uncontested motion and before any memoranda had been filed.

As to whether the ALJ's conclusion in the April 11, 2003 order regarding Plaintiff's substantial gainful activity is supported by substantial evidence, the undersigned concludes that it is. Part-time employment may constitute substantial gainful work. Kelley v. Apfel, 185 F.3d 1211, 1214 (11th Cir. 1999). The ALJ properly determined that Plaintiff's work for five hours per day during the relevant time period was substantial gainful activity. Further, the ALJ does not exclude the months Plaintiff was employed from the sequential analysis of Plaintiff's case. Therefore, Plaintiff's additional arguments regarding Plaintiff's substantial gainful activity are without merit.

### 3.      Hypothetical Question and the VE

Plaintiff next asserts that the ALJ posed a hypothetical question to the VE that did not incorporate all of Plaintiff's physical limitations (Dkt. 10 at 11). Plaintiff also stresses that the hypothetical question did not take into account her mental impairments (Id. at 12). Defendant maintains that the hypothetical question the ALJ posed to the VE included all of Plaintiff's limitations that the ALJ found credible (Dkt. 11 at 15).

Once a claimant has met her initial burden of showing that she cannot do past work, the testimony of a VE is generally required to determine whether the claimant's RFC permits her to perform other work. Chester v. Bowen, 792 F.2d 129, 131-32 (11th Cir. 1986) (citation omitted). The Commissioner may use this vocational testimony to show that there are other jobs in the national economy which plaintiff can perform. Id. In order for a VE's testimony to constitute

_____

pounds occasionally and instead concluded that Plaintiff's RFC included the ability to lift five pounds frequently. The April 11, 2003 RFC is supported by Dr. Linder's examination, which revealed that Plaintiff could walk across a room three times with a 10-pound barbell in her arms. (T 416) Moreover, the jobs identified by the ALJ as available in the national economy do not depend on lifting "more than a pencil or a telephone", according to the VE. (T 458-59)

substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.  Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999) (citing McSwain v. Bowen, 814 F.2d 617, 619-20 (11th Cir. 1987)).  The ALJ is only required to include those restrictions he recognizes in the hypothetical question to the VE.  See Bowling v. Shalala, 36 F.3d 431, 435-36 (5th Cir. 1994).

In this case, the ALJ relied on the testimony of a VE, Joyce Chelle Courtright, to establish that Plaintiff could perform some work in the national economy.  The ALJ asked the VE the following hypothetical question:

> . . . [W]e have an individual who's age 43 to 46 during this time period in questions with high school equivalency education and this past relevant work that you just identified for me.  The first hypothetical, based on Exhibits 14 and 15F is for light work; life, carry, push and pull 20 pounds on occasion, ten pounds frequently; sit, stand, or walk six to eight hours in an eight-hour day, but only occasional reaching with the right upper extremity, the dominant upper extremity; no exposure to dangerous moving machinery or unprotected heights; and secondary to problems with anxiety; no work involving detailed or complex tasks.  Now if I were to agree with that state agency assessment, could any of these past jobs be performed?

(T 456)  The VE answered in the negative and testified that this would erode the range of unskilled, light work the individual could perform by 35 percent. (T 457)

The ALJ posed this hypothetical next:

> And if I were to add to that that only the individual could engage in only occasional fine or gross manipulation with the right upper extremity, can you identify jobs that would be within that residual functional capacity?

(Id.)  The VE testified that such an individual could perform the duties of an information clerk, telephone survey clerk, ticket taker, and usher. (Id.)

The ALJ posed a third hypothetical:

> Now, Ms. Courtright, I want you to assume that lifting, carrying, pushing and pulling is limited to ten pounds on occasion, five pounds frequently.  Again, the individual

> could sit for six hours, stand and walk for just two in an eight-hour day, secondary to
> problems with the knee.  Again, only occasional reaching with the right upper
> extremity and only occasional fine or gross manipulative ability with the dominant
> right upper extremity.  Can you identify jobs within that residual functional capacity?

(T 457-58) The VE answered in the affirmative and testified that such an individual could perform

the jobs of a food and beverage order clerk and telephone information clerk. (T 458)

> The ALJ then asked the VE to consider a final hypothetical:

> Ms. Courtright, if an individual secondary to anxiety were unable to sit or stand or
> walk without having to, at will, alternate these positions, and secondary to anxiety,
> were extremely limited in the ability to focus for any sustained period, could they
> perform any of these light or sedentary jobs that you identified?

(Id.)  To this question, the VE answered in the negative.

> The ALJ's hypothetical to the VE encompassed the limitations which the ALJ recognized.

See Bowling, 36 F.3d at 435-36.  The ALJ properly discredited some Plaintiff's mental impairments,

for reasons discussed above.  Therefore Plaintiff has not shown any error in the vocational expert

testimony upon which the ALJ relied in determining that there were jobs in the national economy

which Plaintiff could perform.

### 4.     ALJ's Findings Regarding Plaintiff's Manual Dexterity

Plaintiff's next argument is that the ALJ's finding regarding Plaintiff's manual dexterity is

in error (Dkt. 10 at 13).  Plaintiff has no bilateral manual dexterity, she contends, and a finding of

disability must be made under Social Security Ruling 83-14, 1983 WL 31254, at *4, as she is

otherwise limited to sedentary work with no transferable skills (Id.).  Defendant does not address

this argument.

As an initial point, the Social Security Administration's rulings are not binding on this court;

however, they are accorded deference.  See Fair v. Shalala, 37 F.3d 1466, 1469  (11th Cir. 1994);

B.B. ex. rel. A. L. B. v. Schweiker, 643 F.2d 1069, 1071 (5th Cir. April 1981).  Moreover, the ALJ

concluded that Plaintiff does not exhibit *significant* manipulative limitations of her ability to handle

and work with small objects with both hands because she is limited to only the occasional use of the

right upper extremity for reaching and for fine and gross manipulative activities.  Because of this

determination, the ALJ did not reach an automatic finding of disability under Social Security Ruling

83-14.[14]  As discussed above, the ALJ's findings regarding Plaintiff's RFC, including the limits the

ALJ placed on her manual dexterity, are based on substantial evidence.

### 5.      ALJ's Consideration of Ms. Volatis's Testimony

Next, Plaintiff argues that the ALJ failed to consider the testimony of Maria Volatis,

Plaintiff's long-time friend who testified on Plaintiff's behalf at the first administrative hearing (Dkt.

10 at 14).  Defendant does not address this argument.

Statements from lay witnesses, including friends and relatives of the claimant, as well as the

claimant herself, constitute valid impairment evidence that must be considered.  See 20 C.F.R. §

404.1512(b)(3).  In addition, it is incumbent on the ALJ to make credibility findings as to claimant's

testimony and any lay witnesses who testify for her.  See generally Ryan v. Heckler, 762 F.2d 939,

942 (11th Cir. 1985).

Moreover, the credibility of witnesses is for the Commissioner to determine, not the courts.

Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991).  Similarly, it is the Commissioner's

responsibility to draw inferences from the evidence that are supported by substantial evidence.

Davis v. Apfel, 93 F.Supp.2d 1313, 1316 (M.D. Fla. 2000) (citation omitted).

---

[14]  According to Social Security Ruling 83-14, if there is a limitation to unskilled sedentary work with an additional loss of bilateral manual dexterity that is significant, a finding of "disabled" is warranted.   1983 WL 31254, at *4.

Ms. Volatis is a registered nurse who testified at the first administrative hearing as Plaintiff's

friend, not as a treating source.  Although she did not testify at the second administrative hearing,

the ALJ's April 11, 2003 decision evaluates her earlier testimony:

> A friend of the claimant testified that the claimant had been depressed and stayed in
> the bed, and she had been afraid to go out or answer the phone.  She stated the
> claimant complained of pain in her right shoulder and elbow and had sustained a loss
> of muscle mass in her hands, and she had lupus that caused unremitting pain.

(T 416-17) After reviewing the record as a whole, however, the ALJ concluded that there was no

medical evidence of lupus and that Plaintiff's mental impairments caused no more than mild

restriction of daily activities, mild difficulties in maintaining social functioning, and moderate

difficulties in maintaining concentration, persistence, or pace. (T 417, 420)

The ALJ's November 3, 2000 opinion also addresses Ms. Volatis's testimony:

> Ms. Volatis testified that claimant had lived with her until June 1999, and although
> she did not actually see her, she often spoke with her.  Ms. Volatis reported the
> claimant had been depressed and stayed in bed, and she had been afraid to go out or
> answer the phone.  She stated the claimant complained of pain in her right shoulder
> and elbow and had sustained a loss of muscle mass in her hands, and she had lupus
> that caused unremitting pain.

(T 13) In explicitly discrediting Ms. Volatis's testimony, the ALJ stated in the November 3, 2000

order:

> Contrary to Ms. Volatis's testimony, a diagnosis of lupus is not supported by
> probative and reliable laboratory and clinical findings, and Dr. Henderson indicated
> that claimant's musculoskeletal complaints were disproportionate to the clinical
> findings.  There is no medical documentation of significant osteoarthritic changes in
> her hands or acute signs of hepatitis C such as weight loss or jaundice.  Another factor
> that tends the discredit the claimant's complaints of incapacitating pain is treating
> source observations of drug seeking behavior.

(T 16-17) Further, as the ALJ notes in its earlier order, Ms. Volatis did not live with Plaintiff during

the entire time period at issue and, once they were no longer roommates, mainly spoke with her over

the phone (T 13).

The ALJ's decision to discredit Ms. Volatis's testimony in the November 3, 2000 order is supported by substantial evidence.  As to the ALJ's consideration of Ms. Volatis's testimony in the April 11, 2003 order, this also was proper.  Because the District Judge did not remand the case for lay witness credibility findings, there was no reason for the ALJ's second opinion to restate a credibility finding included in the first opinion.  Thus, it is reasonable to assume that the ALJ incorporated her previous rejection of Ms. Volatis's testimony into the April 11, 2003 order.  Further, the ALJ's explicit credibility determination as to Plaintiff's testimony contained in the April 11, 2003 order sufficiently implies a rejection of Ms. Volatis's testimony as well.  See Osborn v. Barnhart, 194 Fed. Appx. 654, No. 06-11269, 2006 WL 2447683, at *11 (11th Cir. August 24, 2006) (holding that the ALJ's specific  rejection of claimant's testimony regarding his subjective complaints of pain implied an implicit rejection of his wife's testimony of claimant's daily activities).  Therefore, Plaintiff's position on this issue is without merit.

**D.    Conclusion**

Accordingly, and upon consideration, the undersigned **RECOMMENDS** that:

(1)    The decision of the Commissioner be **AFFIRMED**, that the Clerk of Court enter final judgment in accordance with 42 U.S.C. § 405(g) and close the file, and that each party bear her own costs and expenses.

**Dated: February 8, 2007**

ELIZABETH A JENKINS
United States Magistrate Judge

22

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal.  <u>See</u> 28 U.S.C.  636(b)(1).